Filed 11/30/22  P. v. Laguna CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077324 |
| v. | (Super.Ct.No. RIF1803494) |
| ARTHUR DANIEL LAGUNA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Matthew C. Perantoni, Judge.  Affirmed as modified.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Arthur Daniel Laguna appeals from a conviction for murder under Penal Code section 187, subdivision (a).  On appeal, defendant contends

that (1) the trial court erred in instructing the jury with CALCRIM No. 361; and (2) the unpaid portion of defendant's booking fee must be vacated under Government Code section 6111. For the reasons set forth *post*, we will vacate defendant's unpaid portion of the criminal justice administration fee. In all other respects, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. PROCEDURAL HISTORY

On April 8, 2021, a jury convicted defendant of murder under Penal Code section 187, subdivision (a), and found true that defendant personally discharged a firearm causing great bodily injury or death under Penal Code section 12022.53, subdivision (d).

On June 14, 2021, the trial court sentenced defendant to prison for two consecutive indeterminate terms of 25 years to life, totaling 50 years to life.

On June 22, 2021, defendant filed a timely notice of appeal.

### B. FACTUAL HISTORY

In the early evening of July 31, 2018, in and around the parking lot of a market in Perris, a surveillance videotape recorded defendant driving a dark Mitsubishi Galant aggressively following a white Infiniti sedan. After pulling alongside and engaging in a brief conversation with the driver of the Infiniti sedan, Jacinto Placencia (the victim), defendant parked his car in front of the store. Defendant then retrieved a .45-caliber handgun from the trunk of his car, and watched as the victim drove around the market corner where the victim parked his sedan.

Defendant walked around and confronted the victim. At the time, the victim was standing outside his car and texting with his fiancée. When defendant went toward the

2

victim, the victim retreated around the back of his car. After the victim did not engage with defendant, defendant stormed back to his vehicle, making gestures at and watching the victim.

Defendant then abruptly drove his car around and pulled into a parking spot next to the victim; the victim was now seated inside his sedan. Defendant, who already made motions to exit his vehicle before he was fully parked, got out of his vehicle, ran up to the victim's passenger-side window, and shot the victim with multiple gunshots. The victim died from the gunshot wounds. Defendant then fled the scene.

When police officers responded to the scene, they found two .45-caliber shell casings and an expended bullet inside the victim's car. They also found two more .45-caliber casings, a bullet fragment, and an expended bullet on the ground in the vicinity of the shooting. The officers did not find any guns inside the victim's car.

Later that evening, officers went to defendant's residence and arrested him. After conducting a search for a few hours, officers found a blood-stained black Colt "Series 80," "1911 style" .45-caliber semiautomatic handgun, cocked and ready to fire, with a magazine inserted in it. Defendant's fingerprints were on the gun and the magazine, and forensic testing showed that the shell casings at the scene of the murder had been fired from this gun.

In defendant's bedroom, the officers found live .30-06-caliber rifle ammunition, .45-caliber handgun ammunition and casings, defendant's social security card, and defendant's driver license. Moreover, a 30-06 rifle and a "bipod assembly" were found in the master bedroom, which was close to defendant's bedroom.

3

Furthermore, a .45-caliber ammunition magazine, a box of .45-caliber ammunition, and a stand-alone .45-caliber ammunition round were found inside defendant's vehicle. The driver's seat of defendant's vehicle also had blood spattering on it, and the driver's side door had an inside-to-outside bullet hole in it.

At trial, defendant testified. He stated that he aggressively tailed, confronted, and shot the victim because the victim had threatened defendant, while wielding an AK-47 gun, three or four years before. Moreover, the victim had "mad-dogged" defendant a few times when defendant had seen the victim since the gun-wielding incident. Therefore, defendant said he feared for his life. Defendant testified that he saw the victim in the market parking lot on the day of the murder. Defendant felt the need to confront the victim to clarify that defendant "didn't want no problems" with him. When that proved to be fruitless, defendant, in a fit of fear, shot the victim dead. Defendant then returned to his house and placed the gun where the officers found it. Defendant admitted that the victim did not appear to have a gun or any other weapon with him on the day of the murder.

## DISCUSSION

A.    CALCRIM NO. 361

Defendant contends that the trial court erred instructing the jury with CALCRIM No. 361. We find any error to be harmless.

We review claims of instructional error de novo. (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 604.) In examining whether CALCRIM No. 361 was erroneously given, our task is to ascertain if the defendant failed to explain or deny any fact or

4

evidence that was within the scope of relevant cross-examination, and was within the defendant's knowledge, which he did not explain or deny. (*Id.* at p. 606.) We do not focus on what was adduced during cross-examination, but on what could have been asked of defendant in light of the evidence presented in the prosecution's case-in-chief and the defendant's own testimony. (*Id.* at p. 608.)

In this case, after defendant testified, the trial court was going to instruct the jury with CALCRIM No. 361. Defense counsel objected and the court denied the objection. The court then instructed the jury in the language of CALCRIM No. 361 as follows:

"If the defendant failed in his testimony to explain or deny any evidence against him, and if he can reasonably be expected to have done so based upon what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People still must prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

In *People v. Haynes* (1983) 148 Cal.App.3rd 1117, the second appellate district court of appeal addressed CALCRIM No. 361's predecessor, CALJIC No. 2.62: "We heartily agree that in light of the hostile reception this instruction has received of late from legal logicians and semanticists [citations], it will always be unwise of a trial court to include it among its general instructions without prior inquiry of the parties concerning it. In fact, today it should not even be requested by either side unless there is some specific and significant defense omission that the prosecution wishes to stress or the defense wishes to mitigate. In the typical case it will add nothing of substance to the

5

store of knowledge possessed by a juror of average intelligence. Furthermore, if its terms are adhered to, as presumably they will be, its message will be essentially irrelevant in the absence of some designated glaring hiatus in the defendant's testimony. In such an instance, of course, this lacuna will presumably be the subject of debate and emphasis during the parties' arguments to the jury, with or without the neutral guidelines contained in this recently disfavored instruction." (*Id.* at pp. 1119-1120.)

However, the erroneous use of CALJIC No. 2.62, the predecessor instruction, was often found to be harmless. (See *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472.) The instruction did not direct the jury to draw an adverse inference; it expressly applied only if the jury found a failure to explain or deny evidence. It further cautioned that failure to explain or deny did not create a presumption of guilt or otherwise relieve the prosecution of its burden. (*Ibid.*)

In this case, we need not determine whether the trial court erroneously instructed the jury with CALCRIM No. 361 because, even if the trial court erred in giving the instruction, any alleged error was harmless. Courts have uniformly applied the harmless error standard adopted in *People v. Watson* (1956) 46 Cal.2d 818, when reviewing the erroneous use of CALJIC No. 2.62, the predecessor instruction to CALCRIM No. 361. (*People v. Roehler* (1985) 167 Cal.App.3rd 353, 393.) In applying that standard, we must determine whether it is reasonably probable the result would have been more favorable to defendant had the error not occurred. (*Watson*, at p. 836.) We disagree with defendant's contention that we must apply the harmless beyond a reasonable doubt standard under *People v. Chapman* (1967) 386 U.S. 18. The error, if any, did not violate defendant's

6

federal due process rights. (See *People v. Grandberry*, *supra*, 35 Cal.App.5th at pp. 610-611 [rejecting argument that CALCRIM 361 violated federal due process right to a fair trial]; *People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1066-1067 [rejecting claim that CALCRIM No. 361 violated defendant's due process rights].)[1] Nonetheless, even if we applied the standard under *Chapman*, we find that any error was harmless beyond a reasonable doubt.

In this case, there was no dispute that defendant shot the victim to death. The evidence clearly showed that defendant aggressively tailed the victim then confronted the victim. Defendant then proceeded to shoot the victim, who was unarmed and sitting in his car, multiple times. Even defendant admitted this. Nonetheless, defendant attempted to argue that he was justified in killing the victim because he was afraid of the victim. During his testimony, defendant agreed "that the sum total of times [he] saw [the victim] in, approximately, three to four years was once on Brown Street and a couple of times on Hunter Street." Moreover, during this time, the victim never threatened defendant. However, defendant was afraid of the victim because he "would mad-dog" defendant. When asked what "mad-dog" meant, defendant stated that the victim "would look at me as if I was a rival gang member. That is what I felt. [¶] . . . [¶] [The victim] wouldn't take his eyes off me until I looked away. He was just—I seen he was trying to be intimidating to me." Then defendant again admitted that he "saw [the victim] a total of three times in three to four years, and he quote 'mad-dogged [him]' " Defendant

---

[1] Defendant has failed to address the harmless error analysis under *Watson* in either his opening or reply briefs.

confirmed that the victim never directly threatened defendant but he was afraid because of the victim's reputation.

Moreover, there is no evidence in the record that the victim did anything to engage defendant on the evening of the murder. In fact, defendant testified that the victim essentially ignored defendant that night. Defendant, after seeing the victim, was free to leave. However, defendant did not want to leave because he wanted to go try the food at the new market. Instead of leaving the store after seeing the victim, whom defendant stated he feared, defendant decided to engage with the victim. It was defendant who first saw the victim, who wanted to talk to the victim, who proceeded to engage with the victim, who left—then went back to the parking lot after retrieving his gun to find the victim, and then got out of the car and shot the victim. The victim did nothing to make defendant fear for his life on the night of the murder. There was no evidence that supported defendant's contention that he feared the victim on the evening of the murder.

In addition to the testimonies at trial, defendant's conduct that led up to the murder was captured on video. The jury evaluated the video in addition to the testimonies and other evidence presented at trial.

Based on the above, we find that any error in instructing the jury with CALCRIM No. 361 was harmless under any standard of review. The instruction simply permitted an adverse inference if the jury found the necessary prerequisite of a failure to explain or deny. The jury disbelieved defendant, not because of the perhaps erroneous inclusion of a facially inapplicable instruction, but because his testimony was inherently not worthy of

8

belief. Here, there is no doubt that defendant did not fear for his life on the night he killed the victim.

B.   GOVERNMENT CODE SECTION 6111

At sentencing, the trial court imposed a booking fee of $514.58 under Government Code section 29550. Defendant argues and the People concede that the fee must be vacated.

In 2020, the Legislature passed Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (AB 1869) to "eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system." (Stats. 2020, ch. 920, § 2.) Relevant here, AB 1869 added Government Code section 6111. Both provisions became effective on July 1, 2021. (Pen. Code, § 1465.9, subd. (b); Gov. Code, § 6111, subd. (b).)

Government Code section 6111 now provides that criminal justice administration fees imposed pursuant to Government Code section 29550 are "unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a).)

The plain language of the newly enacted statute dictates that any remaining unpaid balance of the criminal justice administration fee is now unenforceable and uncollectible and the portion of the judgment imposing such costs must be vacated. (Gov. Code, § 6111, subd. (a); *People v. Pacheco* (2022) 75 Cal.App.5th 207, 214-215; *People v. Greeley* (2021) 70 Cal.App.5th 609, 626; *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 952-954; cf. *People v. Clark* (2021) 67 Cal.App.5th 248, 259] [any balance on the

9

defendant's account "for probation supervision fees—that is, any amounts imposed but not paid—is 'unenforceable and uncollectible' " and must be vacated].)

Therefore, we agree with both defendant and the People that the $514.58 booking fee awarded under Government Code section 29550 be vacated.

### DISPOSITION

The portion of the $514.58 booking fee imposed by the trial court pursuant to Government Code section 29550 that remains unpaid as of July 1, 2021, is vacated. In all other respects, the judgment is affirmed. The clerk of the court is directed to modify the abstract of judgment to reflect the modification and to forward a certified copy of the amended abstract to the appropriate authorities. (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 467.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
Acting P. J.

We concur:

CODRINGTON _____
J.

FIELDS _____
J.